### MORRILL v. UNITED STATES.
### No. 940.

District Court, D. New Hampshire.
March 18, 1937.

698

O. Walker Taylor, of Boston, Mass., for petitioner.

Alexander Murchie, Dist. Atty., of Concord, N. H., James W. Morris, Asst. Atty. Gen., and Andrew D. Sharpe and F. A. LeSourd, Sp. Assts. to the Atty. Gen., for the United States.

MORRIS, District Judge.

This is an action at law brought by Allan D. Morrill, executor of the estate of Allan A. Morrill, late of East Kingston, N. H., deceased, to recover the sum of $5,059.09 with interest which was paid under protest to the collector of internal revenue at Portsmouth, N. H., on August 12, 1933.

The action is brought under section 24 (20) of the Judicial Code, as amended, 43 Stat. 972, 28 U.S.C.A. 41 (20).

Allan A. Morrill died February 12, 1932, and Allan D. Morrill was appointed executor of the estate on February 24, 1932.

The $5,059.09 in controversy represents an additional federal income tax of $4,424.40 and interest thereon of $634.69 assessed, demanded, and collected from the petitioner as a deficiency in the individual income of the said Allan A. Morrill for the calendar year 1930. The basis upon which the tax was levied is that during the year 1930 the decedent realized a "capital net gain" of $35,493.56, from the sale or exchange of shares of stock in the Valentine & Co. The amount of the tax was computed at the rate of 12½ per cent. as provided in section 101, Revenue Act of 1928 (26 U.S.C.A. § 101 note). The claim for refund upon which the suit is based was filed on June 24, 1935, and as a basis for the allowance of the refund sets forth the following:

"The refund claimed results from the erroneous determination of the Commissioner that the taxpayer realized a capital net gain of $31,515.56, from the exchange of 315 shares of Valentine Corporation, for $30 per share cash and 6 shares of Valspar Corporation or a total of $9,450 cash and 1890 shares of Valspar stock but (1) there was never any market value for the Valspar stock, (2) the value was represented largely by good will and was almost entirely fictitious, (3) the corporation lost $1,028,000 in 1930 and $1,269,000 in 1931, (4) the stock was determined to be worthless on Feb. 12, 1932, for Federal State Tax in the estate of this taxpayer and (5) the company finally

went into the hands of a receiver and nothing ever was or will be realized.

"Therefore, claimant contends (1) that there was no taxable gain or (2) that such gain, if any, could not possibly exceed the $9,450 cash received. See Articles 573 and 597 of Regulations 74."

Suit was filed in this court February 25, 1936, and after several extensions of time defendant's answer was filed July 11, 1936. It contains a general denial of the facts set forth in the petition.

The jury having been waived by a stipulation in writing the case came on for trial before the court on November 19, 1936.

On or about February 15, 1930, plaintiff's decedent was the owner of 265 shares of the first preferred stock and 315 shares of the common stock of Valentine & Co., a corporation. The said preferred stock had cost the deceased $100 per share and the common stock $64.07 per share.

On or about March 15, 1931, the decedent filed his income tax return for the calendar year 1930, and thereupon paid to the collector of internal revenue at Portsmouth, N. H., the sum of $959.27 the tax shown to be due on said return. No gain or loss based on the sale or exchange of his stock in Valentine & Co. was included by decedent in his return.

Thereafter, following an investigation of his return by an internal revenue agent the Commissioner of Internal Revenue found that decedent had made a capital net gain in the amount of $31,518.56 by reason of his exchange of common stock of Valentine & Co. for cash and stock of Valspar Company and a capital net gain of $3,975 by reason of the cash received for his preferred stock. In the case of the common stock the gain was arrived at as follows:

| | |
|---|---:|
| Received as part consideration in cash | $ 9,450.00 |
| Received in part consideration 1,890 shares of Valspar Corporation with fair market value of $22.35482 per share | 42,250.61 |
| Total value received on sale | 51,700.61 |
| Cost of 315 shares at $64.07 per share | 20,182.05 |
| Profit on sale | 31,518.56 |

In the case of the preferred stock the gain was arrived at as follows:

| | |
|---|---:|
| Received $115 per share for 265 shares | 30,475.00 |
| Cost $100 per share for 265 shares | 26,500.00 |
| Profit on sale | 3,975.00 |

By letter dated May 24, 1933, the Commissioner of Internal Revenue advised the plaintiff of his intentions to assess a tax in the amount of $4,424.40 based on the gain as shown above. Of this amount $3,927.62 was attributed to the gain on the sale of the common stock and $496.88 to the gain on the sale of the preferred stock. It is apparent that the Commissioner treated the transactions as sales of stock. Thereafter this deficiency was assessed together with interest in the amount of $634.69 and on or about August 10, 1933, plaintiff paid the collector of internal revenue the sum of $5,059.09 the amount of the principal and interest on this deficiency. The payment was made under protest.

On or about June 29, 1935, the petitioner seasonably filed in duplicate a claim on Treasury Department Form 843 with the United States collector of internal revenue at Portmouth, N. H., for the refund of said $4,424.40 and the grounds set forth for the allowance of said claim were the same grounds as are alleged as a cause of action in this suit.

The Commissioner did not reject the said claim within six months after the filing thereof and this suit was brought within five years after the payment of the tax as required by Section 3226 of the U. S. Revenue Statutes as amended by Revenue Act of 1926, § 1113 (a), 44 Stat. 116.

At one time Valentine & Co. appears to have been the leading varnish company in the country. Early in 1929 it became apparent that it was loosing ground with the prospect of future substantial loss of business. This condition was due in part to the fact that Du Pont in 1922, appeared on the market with what is know as "Duco" a brilliant lacquer used for coating automobiles, and cut the cost of finishing a car to one-third of the previous cost and made it possible to complete the painting of an automobile in a week instead of a month or more; and in part to the general market conditions of the coun-

try which was beginning to feel the approaching depression.

To combat this competition which was seriously affecting the business of Valentine & Co. it was decided to form a new company which would take over the stock of Valentine & Co., the Con-Ferro Paint & Varnish Company of St. Louis, and the Detroit Graphite Company. It was also decided to diversify and enter into the manufacture and sale of other allied products.

The original plan of merger contemplated an exchange of stock of the Valentine Company for the stock of the consolidated company and in so far as the transaction with Valentine & Co. was carried out there was an exchange effected which provided that for each share of the common stock it would receive $30 in cash and six shares of the stock of the consolidated company.

The new company to be formed was to be known as the Valspar Corporation. Negotiations were in progress during the summer and fall of 1929 and several draft plans were suggested. An agreement was reached with Valentine & Co. and the Con-Ferro Paint & Varnish Company somewhat in advance of the closing transaction with the Detroit Graphite Company.

An appraisal of the physical property of the companies to be consolidated was made by the American Appraisal Company in July, 1929.

There appears to have been objections on the part of the Con-Ferro Company to taking in payment for its property stock of the Valspar Company. It wanted cash. An examination of the minutes of a meeting of the Valspar Corporation held February 15, 1930, shows that its directors were authorized to carry out the plan of merger with Valentine & Co. and the Con-Ferro Paint & Varnish Company. The acquisition of the Detroit Graphite Company did not come until somewhat later.

The property of Valentine & Co. was acquired upon the terms hereinabove set forth. The property of the Con-Ferro Paint & Varnish Company was acquired by the payment in cash of $519,577.56 and the issuance of 4,480 shares of the capital stock of the Valspar Company. The minutes of the meeting contained an alternative option that in lieu of the issuance of the stock above mentioned there should be a further payment in cash of $112,000.

At the same meeting it was further resolved that upon the consummation of the plan and acquisition of the stock of the above-mentioned companies that the officers of the Valspar Corporation "be and they are hereby authorized and directed for the purposes of the balance sheet of this corporation to ascribe to the stock of Valentine & Company and to the stock or assets of Con-Ferro Paint & Varnish Company acquired by this corporation an aggregate value equal to the aggregate value of the net assets" of the two companies acquired.

It was further voted that a bond issue of $6,000,000 principal amount of debenture ten-year 6 per cent. convertible bonds to be dated February 1, 1930, payable February 1, 1940, be authorized and that the form of contract dated February 15, 1930, between the corporation and Brown Bros. & Co. relating to the issue and sale of $2,500,000 principal amount of the above mentioned bonds be sold at a price not less than 93 per cent. of the principal amount of such bonds. How many of these bonds were sold and at what price they were sold does not appear in the record.

The management of the Con-Ferro Paint & Varnish Company did not want to take stock of the Valspar Company in payment for its property. It insisted on cash. A compromise was finally effected by which $519,577.56 was paid in cash and 4480 shares of the capital stock of Valspar was issued for the acquisition of the property, but in order to have the St. Louis Company take the stock Valspar Corporation had to agree to purchase back the stock within one year or find a customer for it on the basis of $25 per share.

The proceeds of the bond issue which had been underwritten by Brown Bros. & Co. was used for the purchase of the St. Louis Company and cash payments in acquiring the stock of Valentine & Co. The reason that $25 per share was fixed as the price was that the directors of Valspar had by their own volition fixed the value of the stock of that company at approximately $22 per share.

On the board of directors at that time was a Mr. Ralph Green of the Brown Company who issued a prospectus published in all newspapers which quoted the stock of Valspar Company as worth $22 per share.

On February 15, 1930, the merger between the Valentine and the Con-Ferro

Companies was completed so that the Valspar Corporation began to function. It was necessary for the Valspar Company in order to obtain material to carry on its business to purchase the Detroit Graphite Company. Negotiations with that company had been broken off in October, 1929, but were resumed in March, 1930. It was finally decided to take over the Graphite Company on slightly different terms from those proposed in the summer of 1929. A Mr. Davis, owning a controlling interest, wanted from two to two and a half million dollars for his company and the treasurer of Valspar Company proceeded to get commitments from banks up to that amount. A contract was signed by which the Valspar Company agreed to pay $2,100,000 cash and $77,000 in bonds, but when the transaction was about to be completed the banks were not satisfied with the statements furnished by Valspar and would loan only $2,000,000 and the Valspar Company in order to complete the transaction had to pledge all of its receivables. The contract with the Graphite Company was closed June 6, 1930. On December 11, 1930, the banks took control of the situation, discharged all of the executives of Valspar Company excepting the treasurer, and put in their own officials. This seems to be the story of the new Valspar Company during the year 1930.

For the first few months of its operation in 1930 the Valspar Company showed a small profit, but by November 30, of that year it showed a loss of $1,000,000 due in part to the write-off of its inventory.

Plaintiff's Requests for Findings of Fact.

Plaintiff's request numbered 1, 2, and 3 are sufficiently covered in the general history of the case. Request No. 4 is denied. Request No. 5 is covered by general findings. Request No. 6 is covered by general findings. Request No. 7 is covered by general findings. Request No. 8 is covered by general findings. Request No. 9 is covered by general findings. Request No. 10, is denied. Request No. 11 is denied except as hereinafter modified. Request No. 12 is in part granted as follows: "The decedent Allan A. Morrill did not sell or dispose of any of the 1890 shares of Valspar stock which he received in the manner aforesaid." Evidence as to the remainder of this request was offered but not received.

Defendant's Requests.

Defendant's request numbered 1, 2, 3, 4, and 5 are historical and are sufficiently covered in the general findings of fact. Request No. 6 is granted as follows: "During the months of February and March 1930 these bonds of the Valspar Corporation were selling approximately at par." Request No. 7 is not granted as written. In lieu thereof I find that the combined balance sheet of the Valspar Company made up as of January 31, 1930, shows capital and surplus of $4,421,675.84. There is included in this statement under the head of liabilities notes payable $300,000 and debenture bonds $2,500,000. Among the assets there is an item of good will $250,000. I cannot find that this summary made up upon that date truly reflects the financial condition of the Valspar Company. I find as a fact that it was made up for trade purposes. Moreover, it is not the summary used by the Commissioner in assessing the deficiency tax. Such tax was assessed on the figures contained in the balance sheet as of November 30, 1929, likewise made up, as I believe for the purposes of trade which gives the capital stock and surplus at $4,526,405, and the outstanding stock as 202,480 shares of no par value. Request No. 8 is denied. Request No. 9 is granted as follows: "Valentine & Company had net profits during the five years preceding the formation of the Valspar Corporation as follows:

| 1925 | $608,280.92 |
| 1926 | 459,875.88 |
| 1927 | 314,419.58 |
| 1928 | 228,379.53 |
| 1929 | 607,902.86 |

Request No. 10 is granted as follows: "The Con-Ferro Paint & Varnish Co., had net profits during the five years preceding the formation of the Valspar Corporation as follows:

| 1925 | $ 39,063.26 |
| 1926 | 25,709.02 |
| 1927 | 45,095.88 |
| 1928 | 93,790.59 |
| 1929 | 142,941.71 |

Request No. 11 is granted with modifications as follows: "In connection with the acquisition of the Con-Ferro Paint & Varnish Company, an option was given to that Company to take $419,577.56 and 4,480 shares of the capital stock of the Valspar Corporation or in lieu of said stock the payment of the further sum of $112,000 in cash. The Con-Ferro Paint & Varnish Company elected to take the stock," be-

cause, as hereinabove stated, the Valspar Company did not have the cash to pay the $112,000, or if it did, it did not want to use it and agreed to purchase back the stock or secure a purchaser for it on the basis of $25 per share. Request No. 12 is granted as follows: "The board of directors of the Valspar Corporation on March 5, 1930, place a value of $25 on each share of its own stock issued in acquiring the Con-Ferro Paint\ & Varnish Company." Request No. 13 is granted with additions. "On October 18, 1929, Otto A. Hasse purchased from Valentine & Company, of which he was an officer, 2,000 shares of the common stock of that company at a price of $140.26 per share." This contract of sale canceled a previous contract dated the 14th day of August, 1928 (Defendant's Exhibit J). Request No. 14 is granted as follows: "The board of directors of the Valspar Corporation on March 5, 1930, placed a value of $163.767 on each share of Valentine & Company common stock held by the Valspar Corporation." Request No. 15 is granted as follows: "The board of directors of the Valspar Corporation on March 5, 1930, placed a value of $22.2949 on each share of its own stock issued in acquiring Valentine & Company." Request No. 16 is granted with modifications: "Mr. Ralph Green one of the directors of the Valspar Corporation and an officer of Brown Brothers Company, brokers, issued a prospectus, published in all the newspapers at the time of the organization of that corporation, in which it was stated that the capital stock of the Valspar Corporation was worth $22.00 per share. The balance sheet included in this prospectus showed approximately capital and surplus for the Valspar Corporation of $4,421,675.84." Request No. 17 is granted as follows: "On May 20, 1930, the Valspar Corporation entered into a supplemental agreement for the purchase of the Detroit Graphite Company wherein the latter was given the option of receiving $2,200,000 and 77,000 shares of the capital stock of the Valspar Corporation or $2,000,000 and 85,000 shares of the capital stock of the Valspar Corporation." Request No. 18 is granted as follows: "On June 6, 1930, the Valspar Corporation bought the Detroit Graphite Company for $2,500,000 which the Valspar Corporation borrowed from banks on short term notes hypothecating all its receivables." Request No. 19 is denied. Request No. 20 is denied.

## Conclusions of Fact.

From the foregoing findings of fact, I deduce the following conclusions:

On February 15, 1930, at the time the stock was exchanged the entire plan of merger had not been carried out. There could be no recognized fair market value of the Valspar stock until the merger was completed. There were no sales of Valspar shares and they were not listed on any stock exchange. Its fair market value could not be determined from its book value alone or by fiat of the officers of the corporation. The values so fixed were in anticipation of a further bond issue or to be used in obtaining commitments for the purpose of acquiring the Detroit Graphite Company.

Whatever may have been the value of Valentine & Co. stock before the exchange was made, when it became merged with the stock of Valspar Corporation it lost its financial standing for the purposes of taxation and was worth no more to the taxpayer than the fair market value of stock received in exchange. While evidence of the value of Valentine & Co. stock prior to the organization of Valspar is evidence to be considered, it is by no means conclusive. We cannot assume that the value of Valspar stock plus $30 in cash was equivalent to the value of Valentine stock before the merger took place. It was essential that Valspar stock establish its own approval in financial circles before its fair market value could be accurately determined for taxation purposes. Although the Valspar Company took over the entire physical assets of Valentine, Con-Ferro, and Detroit Graphite, the shareholders of those companies were not willing to exchange stock for stock without a substantial payment in cash.

Whatever gain or loss the taxpayer anticipated from the merger, the value of his stock received in exchange could not be determined except by establishing the fair market value of Valspar stock which determination could not be made from the book value alone but must be determined from such facts as appear after the merger had been completed. The government cannot tax nonexistent or illusory profits. The basis upon which the Commissioner determined the tax upon the taxpayer's exchange of his common stock in Valentine & Co. for $30 in cash and six shares of Valspar stock was arbitrary and

unwarranted when all the facts are taken into consideration.

I find as a fact that the decedent did not realize any taxable gain or loss by the transaction of February 15, 1930, by virtue of the fact that his 315 shares of common stock of the Valentine Company which had cost him $64.07 per share or a total of $20,182.05 were exchanged for Valspar stock on the basis of $30 per share in cash or a total of $9,450, and 1,890 shares of the stock of Valspar Corporation of no par value. The exchange was fair, and while profits may have been anticipated, anticipated profits not reducible to cash are not taxable. There was no capital net gain resulting from the transaction.

### Preferred Stock.

I find that the decedent was the owner of 265 shares of the preferred stock of Valentine & Co. which had cost him $100 per share or $26,500. He received in cash $115 per share or a total of $30,475; he realized a taxable net gain from the sale of preferred stock of $3,975.

Upon the foregoing findings of fact which are hereby made a part of the judgment herein the court finds and enters the following rulings of law:

### Conclusions of Law.

The first legal question raised by the plaintiff is founded upon the language of section 101 of the Revenue Act of 1928, c. 852 (45 Stat. 791, 811, 26 U.S.C.A. § 101 note).

It is claimed that "The basis upon which the Commissioner of Internal Revenue determined the tax in this case is arbitrary, prejudicial and entirely unwarranted under the statute."

Section 101.

### Capital Net Gains and Losses.

"(a) *Tax in Case of Capital Net Gain.* In the case of any taxpayer, other than a corporation, who for any taxable year derives a capital net gain (as hereinafter defined in this section), there shall, at the election of the taxpayer, be levied, collected, and paid, in lieu of all other taxes imposed by this title, a tax determined as follows: A partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner as if this section had not been enacted and the total tax shall be this amount plus 12½ per centum of the capital net gain."

In the case at bar the taxpayer has made no election. Notwithstanding that no election has been made, the Commissioner has assessed the deficiency tax on a basis of 12½ per cent.

It seems plain under the statute that the election mentioned in section 101 is that of the taxpayer and not that of the Commissioner, and unless the taxpayer makes an election it is the duty of the Commissioner to assess capital net gain as ordinary income.

The deceased could not be criticized or lose his right of election because in his original return he did not include any capital net gain and could not anticipate that a deficiency tax would be assessed. There was, however, a period between May 24, 1933, and the date when the tax was actually assessed within which the administrator of the deceased could have made an election provisional upon the Commissioner's assessment being found correct. As there is nothing before me indicating an election has been made, I hold that the tax assessed is not invalidated because assessed by the Commissioner on a basis of 12½ per cent. of the capital net income; but see W. A. Forrester v. Commissioner, 32 B.T.A. 745, 749; Fifth Third Union Trust Co., Trustee, v. Commissioner, 20 B.T.A. 88; Appeal of James F. Hoey, 4 B.T.A. 1043.

The defendant contends that facts and circumstances resulting from the exchange of the common stock subsequent to February 15, 1930, are immaterial and should not be received in evidence. I ruled that evidence having a tendency to establish a fair market value of the Valspar stock should be limited to the taxable year as upon this basis the taxpayer would act in making up his original return. To this ruling the government objected and excepted, claiming that it was only facts and figures prior to February 15, 1930, that should be received in fixing the value of the Valspar stock on that date.

It would hardly be contended that if the deceased at any time subsequent to February 15, 1930, during the taxable year had sold his Valspar common stock for $40 per share that the government would have ignored the sale and assessed the tax upon the basis of $22 per share. What is fair for the government should be fair for the taxpayer, and conditions during the taxable year should be taken into consideration.

The plaintiff contended that because the Valspar stock was not listed on any stock exchange and no sales of it had been made that therefore it had no market value.

"It is not necessary that a property shall be for sale before it can have a market value. Neither is it necessary that there shall be a known buyer for it."

Market value is so dependent upon times, places, conditions, and people that that which is a good rule in one case may be no rule under other circumstances. Chicago Ry. Equipment Co. v. Blair (C.C. A.) 20 F.(2d) 10. I cannot say that because there were no sales of Valspar stock and it was not listed on any stock exchange that therefore it had no fair market value. Its value should be determined as of February 15, 1930, and in the absence of definite evidence of sale, in making such determination all the circumstances leading up to the transaction and conditions subsequent thereto within a reasonable time not exceeding the taxable year should be taken into consideration. The taxpayer in making out his income tax return would be expected to so consider it.

It appears from Plaintiff's Exhibit 4, the report of the Examiner, whose recommendations the Commissioner accepted, that the Examiner did not feel at all certain that a deficiency tax should be assessed upon the Valspar common stock. He says in his report, "In view of the uncertainty as to the taxability of the exchange, it is recommended that this case be referred to the proper unit for determination of the taxable status." And again he says that the government's interest should be protected pending a ruling.

In my view of the case the transaction was a merger of three companies into one. Some of the stockholders of Valentine & Co. became officers of the Valspar Company. There was an exchange by this taxpayer of his stock in the Valentine Company for cash and stock in the Valspar Corporation quid pro quo. Except for the fact that the evidence and arguments of counsel have taken a wide range, this rescript would have been such shorter, because as I view the case it is no more than an exchange of stock in one corporation for that in another. If there was any expectation of a profit to the taxpayer resulting from the merger, it was no more than an expectation not in itself taxable.

Neither can I find that any loss was anticipated. Six shares of Valspar stock plus $30 per share equal the cost price of the Valentine common stock, $64.07, and if under the conditions it is necessary for a determination of the value of the Valspar shares, I find that they were worth $5.6783, which multiplied by 6 is equivalent to the difference between $30 and $64.-07.

I find neither gain nor loss on the exchange of common stock, and as a consequence what the taxpayer received from Valspar equaled the cost of Valentine.

Plaintiff's Request for Rulings of Law.

Plaintiff's request No. 1 appears to be sufficiently covered by my rulings above.

Plaintiff's request No. 2 is granted as follows: "The decedent did not as a matter of law realize any taxable gain by the transaction of Feb. 15, 1930, by virtue of the fact that the 315 shares of common stock of the Valentine Company had cost him $64.07 per share or a total sum of $20,182.05, whereas he received therefor (1) only $30 per share in cash or a total sum of $9,450.00, and (2) 1890 shares of the stock of the Valspar Corporation which had no par value and no known market value."

Plaintiff's request No. 3 is granted as follows: "As a matter of law the exchange of his 315 shares of common stock of the Valentine Company by the decedent on Feb. 15, 1930, constituted an uncompleted transaction whereby he did not receive back the full cash value which his said shares had cost him and no taxable gain could be realized unless or until he sold the 1890 shares of stock of the Valspar Corporation and received therefor a sufficient sum in money or moneys worth which together with the $30 per share cash would exceed the $64.07 per share which the said Valentine stock had cost him."

Plaintiff's requests 4, 5, and 6 result from findings of fact and do not state principles of law and are denied except so far as covered by my general findings of fact and conclusions of law.

### Defendant's Requests.

Defendant's requests Nos. 1, 2, 3, 4, 5, 6, and 7 are denied. Exceptions will be allowed to either or both parties for the refusal of the court to find as requested with respect to the facts and conclusions of law.

Conclusions.

Cost of preferred stock:
265 shares preferred at $100
per share — $26,500.00
265 shares preferred sold at
$115 per share — 30,475.00

Net gain — 3,975.00
Tax assessed on same — 496.88
Interest on same .1434 — 71.32

The above amount was assessed and paid by the taxpayer and I hold it cannot be recovered back.

Cost of common stock.
315 shares common at $64.07 — $20,182.05
Received $30.00, plus 6 shares
Valspar stock for each share of
Valentine
No net gain or loss — 20,182.05

Tax assessed on same — 3,927.52
Interest on same at .1432 — 563.37

I find that the tax on the common stock was wrongfully assessed and that the plaintiff is entitled to recover the same.

I find a verdict for the plaintiff in the sum of $4,490.89.